**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **TOM HAYDEN,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 4:08cv172** |
| | § | **JURY** |
| **GARDEN RIDGE MANAGEMENT,** | § | |
| **LLC,** | § | |
| **Defendants.** | § | |

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** Plaintiff, Tom Hayden, and files this Plaintiff's Response to Defendant's

Motion for Summary Judgment:

**SUMMARY OF ARGUMENT & ISSUES**

This is an action brought to correct violations of the Family and Medical Leave Act

("FMLA") and Title VII of the Civil Rights Act of 1964 ("Title VII").   Specifically, Tom

Hayden was denied FMLA benefits and retaliated against in violation of the FMLA and Title VII

when his employment was terminated less than 10 days after submitting a request for leave under

the FMLA due to the upcoming birth of his child.   At the time he requested FMLA Leave, the

Defendant made it plain that it frowned not only upon the timing of the leave (he would be off on

3 separate leaves and during peak times), but also the reason for the requested leave (unusual for

a man to take so much leave for the birth of a child).   Although FMLA leave was initially

granted, before he had a chance to take the protected leave, Defendant quickly terminated

Hayden.  The summary judgment evidence directly controverts the stated reason for termination

and establishes material fact issues on the issue of pretext as to each of Hayden's asserted claims.

## SUMMARY JUDGMENT EVIDENCE

**Exhibit 1:**   Declaration of Tom Hayden (and attachments 1-A to 1-M)

**Exhibit 2:**   Declaration of Rudy Bierra

**Exhibit 3:**   Relevant Excerpts from Deposition of Tina Laube

**Exhibit 4:**   Relevant Excerpts from Deposition of Albert Troutman

**Exhibit 5:**   Relevant Excerpts from Deposition of Allen Bauwin

**Exhibit 6:**   Relevant Excerpts from Defendant's Answers to Interrogatories

**Exhibit 7:**   9/15/07 E-mail re: Recent Visit @ 23

**Exhibit 8:**   October 3, 2007 E-mail re: FMLA

**Exhibit 9:**   FMLA approval letter dated 10/5/07 and excerpt from request

**Exhibit 10:**   September 26, 2007 E-mail re: Wk-35 Labor

**Exhibit 11:**   October 10, 2007 E-mail re: Tom Hayden St-23 Management Schedules

**Exhibit 12:**   August 17, 2007 E-mail re: Store 23 Visit Recap 8-16-07

**Exhibit 13:**   October 10, 2007 E-mail re: schedule up

**Exhibit 14:**   Excerpt from Handbook: Dating Policy

## Response to Statement of Undisputed Material Facts

In support of this response to Defendant's motion for summary judgment, Plaintiff relies on the following facts, which unless otherwise indicated are set forth in Exhibit 1, the Declaration of Tom Hayden:

## Hayden's Initial Employment Success

Tom Hayden began working for the Defendant in July 2006 as a General Manager in Training.  Within 30 days, he was promoted to General Manager at the Grand Prairie Store.  This store was in bad shape, but within 3 months Hayden had turned it around. Based on this success, in November 2006, Hayden was transferred to the General Manager position at Garden Ridge Store #23 in Lewisville.  This store was many months behind in shipment processing causing sales to be drastically reduced.  It was also losing market shares and there was internal theft. Tom Kibarian, the CEO, told Hayden that the Lewisville store was so bad that he was getting customer complaints concerning the store's condition.

## Hayden's Working Relationship With Bauwin

In approximately April 2007, Allan Bauwin became Hayden's District Manager and Al Troutman became the Director of Stores over the Lewisville store.[1]  During this time, the store's management team was extremely understaffed.   Based on the volume of Lewisville store's revenue, there was supposed to be a six-member management team.   From the time that Hayden assumed the General Manager position at the Lewisville Store, the management staff was never at the required six-member team until late September or early October 2007.   Knowing that

---

[1] Bauwin officed next to Hayden at Store 23.  Hayden was instructed by Bauwin to set up an in office mailbox for him at the Lewisville store to allow him to receive all store and corporate communication, including all weekly management schedules and store issues. A store communication board was also placed on the wall between Hayden and Bauwin's offices.  This board was used to update and inform Bauwin on all store issues at the Lewisville store. All management staff along with Bauwin routinely monitored this communication board for all in store and corporate updates and weekly management schedules.

Hayden was not able to effectively schedule to the suggested scheduling guidelines presented in late August 2007, Bauwin instructed Hayden to continue to create weekly management schedules to the best of his ability and to simply keep him and corporate abreast of the schedule. This was accomplished through faxes to the corporate office and Bauwin.  In addition, Bauwin received a hard copy of the manager's weekly schedule, which he picked up each week from his in store office mailbox at the Lewisville Store.

At no time did  Bauwin ever indicate that he was not happy with any part of Hayden's manager's schedules, nor did he ever instruct Hayden to complete a 4-week monthly schedule for him until October 1, 2007, which he promptly did.[2] Bauwin and Hayden would on occasion work on the manager's schedule together because Bauwin would pull the limited management staff to assist him at other store locations performing other projects.[3]  Bauwin was regularly kept abreast of Hayden's schedule via phone calls and e-mails to him.

### Hayden's Continued Employment Success

During Hayden's tenure as General Manager at the Lewisville Store, he was recognized and praised for his accomplishments.  In the summer of 2007, Al Troutman and Tina Laube (Vice President) were so pleased with Hayden's accomplishments at the Lewisville Store that they offered Hayden a promotion to the position of District Manager for the Atlanta, GA market (which he respectfully declined).   Troutman also recognized Hayden's accomplishments throughout his tenure, the most recent of which was in August 2007, when Troutman rated the

---

[2]  See Exhibit 1-A, Bauwin's October 1, 2007 email addressing following corporate directions "unless you have partnered with me", which Hayden had done.
[3]  See Exhibit 1-B, 1-C, and 1-D, emails just prior to Hayden's termination, sent to Bauwin from Mr. Hayden regarding scheduling changes as requested by Bauwin.

Lewisville store an "A". [4]  Bauwin also commented within the same e-mail: "It is always a good feeling knowing that I do not have to worry about your store.  Thanks for all your hard work."[5]

Additionally, in an email dated August 14, 2007, Bauwin used Store #23 as an example for his district to follow for clearance product merchandising. A picture of how to display clearance product was taken at the store and sent to the entire chain as an example by which to follow.  Tina Laube also used this as an example to the entire chain on how to present clearance product.[6]

## The September 15, 2007 Store Visit

On September 14, 2007, at approximately 8 p.m., Bauwin stopped by the Lewisville store in order to look at the store prior to an impending visit by Laube and Kibarian.  Bauwin found the store to be in great shape and only pointed out that one missing item (a pink Christmas tree) which Hayden located and set up.

On September 15, 2007 at approximately 9 a.m., Laube and Kibarian arrived for a walk through of the store.  Allen Bauwin and Rudy Biera were also present.  At the start of the walk through, Laube questioned why the pink Christmas tree had just been put on the display that morning.  Hayden replied that they had not been able to locate it. During the tour, Kibarian questioned Biera on a particular merchandising approach that he made concerning merchandising one box of Christmas ornaments.  Laube also questioned Hayden's thought process on placing t-shirts on hangers versus folding them on the shelves.  Hayden replied that there was no hard plan a gram concerning how to display this product on the shelves and that it was more customer friendly to have them on hangers.  This approach helped by saving payroll

---

[4] See Exhibit 1-E.
[5] *Id.*
[6] (See Exhibit 1-F and 1-G, true and correct copies of emails (without attached photos).

dollars and wasted store recovery time.  Kibarian stated he liked this approach and instructed Hayden to leave the product on hangers and he would monitor its effectiveness. At the conclusion of the tour, Biera and Hayden asked Laube for clarification on a recent store policy forbidding facial piercing.  After this conversation, Laube stated that the Lewisville store could possibly be the best looking in store in the chain.

Contrary to Defendants claims, never was there any mention by Laube or Kibarian that Hayden's job was in jeopardy or that he would be fired[7].  After the walk through, Hayden followed up with Laube and Kibarian by email on the basic notes of the walk through.  Again, there was no mention by Kibarian that Hayden's job was in jeopardy.[8]

**Defendant's Stated Reason**

Defendant claims on summary judgment that at the time of the September 15th store visit, Laube had directed that Hayden be terminated if there was "any other failure to follow company direction or violation of policy or procedure."[9]

**Two Subsequent Pre-FMLA Request Violations Resulted in No Adverse Action**

According to company e-mails, however, Hayden apparently violated policy on two different occasions between the September 15th and October 1, 2007 with absolutely no adverse consequences.[10]  It was only after Hayden requested FMLA leave on October 3, 2007 that he was terminated.

---

[7]  See also Exhibit 2, para. 8.
[8]  Exhibit 7.
[9]  Def's Exhibit E, para. 5 and 7.
[10] Def's Exhibit E, para. 5 and 7.

**Hayden's Request for FMLA Leave was met with Negativity**

Hayden requested FMLA leave for the birth of his child, and subsequently care for this child, on October 3, 2008.[11]  This request for 3 sets of intermittent FMLA protected leave was met with negativity by both Human Resources and Bauwin.  Specifically, when Antoinette Narin from Human Resources called to go over Hayden's requested FMLA dates, she questioned the large number of dates requested and stated, "It's very strange that we have a male manager request that amount of time off, we have never had that before."

When Bauwin learned about the leave request, he e-mailed to Human Resources questioning whether Hayden could take the company had to "honor a request like this with the dates broken up."[12]  Bauwin also inquired: "Have you ever herd [sic] of someone breaking up a leave like this when expecting a child?"[13] He then set forth the reason he had a problem with each requested leave period:  "peak holiday time", "inventory" and "peak patio pottery set up/his store remodel."[14]  In response, Rita Richards, the Human Resources Manager, confirmed that there was something called intermittent leave, but then stated "I don't know the circumstances surrounding the his particular situation so I don't know how it might be eligible for the intermittent leave."[15]  Richards then suggested: "If you haven't spoken to him, as his direct supervisor you should see what he shares".  Richards further explained: "although he's not obligated to give you any particulars" . . ."he may give you insight into what he's requesting."[16]

---

[11] Exhibit 9.
[12] Exhibit 8.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*

Richard's response contains no reminder to Bauwin that it is unlawful to interfere with or retaliate against an employee for seeking FMLA leave.[17]

**The Post-Request Hunt for a Reason to Terminate**

After Hayden's FMLA leave was requested,  Bauwin started a "witch hunt" against Hayden.  Instead of being in the store once a week, he was there daily, nitpicking the store and Hayden's work.  Hayden also received calls from management staff that Bauwin was asking them a lot of questions about Hayden and his work, including nitpicking Hayden's scheduling practices of managers.    Bauwin ultimately claimed that Hayden violated the scheduling policy on October 10, 2007.[18]   Hayden was terminated on October 12, 2007.  The termination came less than 10 days after requesting FMLA leave.  Hayden disputes that he violated the scheduling policy and legitimacy of the stated reason for termination.


**ARGUMENT & AUTHORITIES**

**A.  HAYDEN'S CLAIMS UNDER THE FAMILY MEDICAL LEAVE ACT**

The summary judgment evidence establishes material fact issues regarding whether Hayden was terminated in violation of the Family Medical Leave Act based on both an "entitlement" theory and a "retaliation" theory.[19]

---

[17] *Id.*

[18]  See Exhibit 11.

[19]  The FMLA contains one provision granting prescriptive or substantive rights, and one granting proscriptive rights. *See* § 29 U.S.C. 2615(a)(1) (granting prescriptive rights); 29 U.S.C. § 2615(a)(2) (granting proscriptive rights)  Prescriptive claims brought pursuant to § 2615(a)(1) are sometimes referred to as "interference" or "entitlement" claims, while proscriptive claims brought pursuant to §2615(a)(2) are sometimes referred to as "retaliation" claims.

## 1.      Hayden's "Entitlement Theory" FMLA Claim

The FMLA entitles eligible employees to twelve work-weeks of leave in any 12-month period for various qualifying events, including "because of the birth of a son or a daughter of the employee and in order to care for such son or daughter". 29 U.S.C. § 2612(a)(1)(A).[20]

Here, Defendant asserts that Hayden's "entitlement" claim fails because he cannot prove that he was denied the FMLA benefits to which he was entitled by reason of the fact that the FMLA leave was approved.[21]  This initial approval does not warrant summary judgment because almost as soon as the leave was granted, Defendant turned around and terminated Hayden for pretextual reasons prior to the start of the leave[22].   The Defendant, however, cannot avoid an FMLA "entitlement" claim by approving the leave only to then unlawfully terminate the employee prior to the actual taking of the leave. *See Grubb v. Southwest Airlines*, 296 Fed. Appx. 383, 391 (5th Cir 2008)(affirming summary judgment on entitlement claim because any right the employee had to take FMLA leave was extinguished by the employer's legitimate non-FMLA based reason for termination).

It is undisputed that Hayden was entitled to FMLA leave[23] and, for the reasons set forth below in the "Pretext" section of this response, the summary judgment evidence establishes material fact issues regarding whether the Defendant's stated reason for termination was a pretext for unlawful retaliation and discrimination under the FMLA and Title VII.  Therefore, for the same reasons, summary judgment is not proper on Hayden's FMLA "entitlement" claim.

---

[20]  It is undisputed that Hayden was an eligible employee and entitled to FMLA leave. See Exhibit 9.
[21]  Def's Motion, p. 14.
[22]  See discussion and evidence set forth in the pretext section of the "Retaliation Theory FMLA Claim" portion of this response which is incorporated herein for purposes of brevity.
[23]  Exhibit 9.

## 2.      Hayden's "Retaliation Theory" FMLA Claim

Defendant next moves for summary judgment on Hayden's "Retaliation Theory" FMLA claim on the issue of causation and pretext.[24]

To establish a prima facie case of retaliation under the FMLA, Plaintiff must show that: (1) he was protected under the FMLA; (2) he suffered an adverse employment decision; and either (3a) he was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because he sought protection under the FMLA.[25] If Plaintiff succeeds in making a prima facie case, the burden shifts to Defendant to articulate a legitimate nondiscriminatory or nonretaliatory reason for the employment action.[26]   If this occurs, the burden shifts to Plaintiff to show that Defendant's stated reason is a pretext for retaliation.[27]   Hayden easily meets his burden.

### a.   There are material fact issues that Hayden was terminated because he requested FMLA Leave

Here, Defendant does not dispute that Hayden can establish the first two elements of the *prima facie* case of FMLA retaliation.    In fact, Hayden was an eligible employee who was entitled to FMLA Leave for the birth of his son.[28]   Hayden requested FMLA leave for this reason and suffered an adverse employment action when he was terminated.[29]

### i.       The false and pretextual "stated reason".

Defendant, however, asserts that Hayden cannot establish the third element of the *prima facie* case because his termination was allegedly contemplated before he requested FMLA

---

[24]  Def's Motion, p. 15-22.
[25]  *Hunt v. Rapides Healthcare Sys., LLC,* 277 F.3d 757, 768 (5th Cir.2001); *Mauder v. Metro Transit Auth. Of Harris County, Tex.* 446 F.3d 574, 583 (5th Cir. 2006).
[26]  *Id.*
[27]  *Id.*
[28]  Exhibit 1.
[29]  Exhibit 1.

leave.[30]   Specifically, Defendant asserts that during a September 15th store visit, Tina Laube considered terminating Hayden, but instead instructed Al Troutman that Hayden would be terminated should there be any other failure to follow company direction or violation of policy or procedure.[31]   Troutman also claims that this instruction was given to him who then so instructed Allan Bauwin.[32]   Laube further swears that when she was notified by Troutman on October 11, 2007 that Hayden had posted a non-compliant schedule, she instructed Troutman to terminate Hayden based on her prior instruction to terminate Hayden if he was found to be breaking policy.[33]   The summary judgment evidence directly disputes the legitimacy of this stated reason for termination and establishes material fact issues on both causation and pretext.

### i.a.   Facts establish that the alleged 9/15 final warning asserted by Defendant as the basis for termination is a fabrication

First, both Tom Hayden and Rudy Biera confirm that no such warning was given to Hayden.[34]   The e-mails sent at the time re-capping the store visit also reference no such final warning.[35]   For instance, Hayden states his feeling of encouragement at having been told by Kibarian and Laube that his store was "close to being excellent and could possibly be the best looking store in the chain."[36]   Kibarian also states: "You've built a great team, and if you simply follow the instructions we provide you . . ., you're going to have a great September Shopathon and fall season." There is no mention of a final warning by either Kibarian or Hayden in this e-mail re-cap of the September 15th store visit.[37]

---

[30]  Defendant's Motion, p. 15.
[31]  Def's Motion, p. 16; Def's Exhibit E, para. 5 and 7.
[32]  Exhibit 4, p. 71, lines 2-19 and p. 98, line 18-p. 99, line 4.
[33]  Def's Exhibit G, para. 8
[34]  See Exhibit 1, para. 10 and Exhibit 2, para. 8.
[35]  Exhibit 7.
[36]  Exhibit 7.
[37]  Exhibit 7.

Moreover,  Allan Bauwin states in his Declaration that he was not aware that Laube had directed Hayden to be terminated if another violation occurred (and Laube herself claimed Bauwin was "always within earshot" during the entire store visit).[38]

Of greater significance to the issue of causation and ultimately, pretext, however, is the fact that although claiming there was a September 15th (pre-FMLA request) mandate to terminate if there was "any other failure to follow company direction or violation of policy or procedure", according to company e-mails, Hayden apparently violated policy on two different occasions between the September 15th  and October 1, 2007 with absolutely no adverse consequences.[39] The first was an alleged "blatant abuse of scheduling" which was documented in a September 26, 2007 e-mail from Bauwin to Troutman and subsequently forwarded to Laube.[40]  Contrary to Defendant's now claimed stated basis for termination (i.e., terminate if one more violation), Hayden was hardly terminated, nor was he even warned that he would be terminated for future violations.  Rather, he was told that a future occurrence "will result in written documentation."[41] Rather than immediately terminate Hayden, was clearly what would have happened if the Defendant's now proffered "stated reason" for termination were actually true, Laube merely commented: "Wow, that is amazing the GMs still don't know they have to come in on budget."[42] Thus, Laube was made aware on September 26th of an allegedly "blatant scheduling violation"

---

[38]  Def.'s Exhibit F, para. 11; Exhibit 3, p. 36, line 24—p. 37, line 4.  The waters, however, are clearly muddy on this point as Bauwin's Declaration contradicts his own deposition testimony as well as that of Al Troutman. Specifically, Bauwin testified that he heard either Laube or Kibarian tell Hayden that he would be terminated if issues not corrected.  Exhibit 5,  p. 55, line 3- p. 56, line 7.  In contrast, Troutman confirmed that he personally did not ever notify Hayden that he would be terminated for any additional policy violation, but rather claimed that Bauwin had reported doing so at Troutman's instruction. Exhibit 4, p. 98, line 12-p. 99, line 4.

[39]  Def's Exhibit E, para. 5 and 7; Exhibit 1-A, Exhibit 10.  Not only does Laube assert in her Declaration that she has issued this directive to terminate upon one more violation, but she also was very adamant about this in her deposition, for example:  "I had directed that he be terminated after that September visit. As far as if there were any further incidents of him not following policy or not executing the plan, I told Al specifically that there would be no more chances and he would be terminated immediately . . . ." Exhibit 3, p. 85, lines 1-7.

[40]  Exhibit 10.

[41]  *Id.*

[42]  *Id.*

by Hayden for which he would be merely be written up if it happened again.  That Laube merely made some snide remark rather than immediately terminating Hayden on September 26th for this reported policy violation directly contradicts her sworn Declaration and deposition testimony establishes that said testimony is false.  It also establishes that there was no such directive to terminate Hayden *until* after he requested FMLA leave.

Even more evidence of pretext is established when just a few days later, Bauwin claimed to have found Hayden in violation of the scheduling policy.[43]   In an October 1, 2007 e-mail to Hayden, Bauwin alleges that Hayden had not followed corporate direction in submitting schedules and even claimed "you are the only store manager in the company that has chosen not to follow this directive."[44]   In this same e-mail, Bauwin also complained that Hayden had not met the scheduling requirements for coverage.[45]   Hayden was hardly terminated, or even threatened with a write-up, but rather was told: "In the future, I expect you to follow this and all corporate directives unless you have partnered with me."[46]

Thus, based on the Defendant's own company documentation, there was clearly no directive at the time to immediately terminate Hayden for any future violation after September 15th.  Such an alleged pre-FMLA decision and instruction to terminate plainly only materialized after-the-fact in an effort to avoid liability for unlawful retaliation.  Based on this undisputed summary judgment evidence, Defendant's stated reason for termination is clearly false and is a pretext for retaliation under the FMLA.

It is obvious that a hunt for a reason to terminate Hayden started *after* he requested FMLA leave on October 3, 2009.   Assuming *arguendo*, even if Defendant's story were to be

---

[43]  Exhibit 1-A
[44]  *Id.*
[45]  *Id.*
[46]  *Id.*

believed that Laube decided on September 15th that Hayden was to be terminated if he committed "one more violation", this clearly did not happen when he was accused of a violation on September 26th or again on October 1st.  It was only when an alleged violation occurred on October 10th, just 7 days *after* Hayden requested FMLA leave, that Hayden was immediately terminated.  Thus, when viewed in the light most favorable to Hayden, the evidence establishes serious fact issues disputing Laube's claim that she decided to terminate Hayden as of the September 15th store visit if one more violation occurred and notified him of this intent.  Also, for this reason, the *Woodson* case relied by Defendant is clearly distinguishable in that, unlike Hayden's case, it was undisputed that Woodson had received a final written warning prior to the leave request.[47]

The Fifth Circuit recognizes that the pretext inquiry focuses on the authenticity of the employer's proffered reason.  *See Nasti v. CIBA Specialty Chemicals Corp.*, 492 F.3d 589, 594 (5th Cir. 2007).  "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Wright v. West,* 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992).  A "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105

---

[47]    *See Woodson v. Scott and White Mem. Hosp.,* 255 Fed. Appdx. 17, 19-20 (5th Cir. 2007).   Additionally, the *McGarity* case cited by Defendant is also distinguishable in that McGarity admitted that he made the mistake that led to his suspension and 2 other employees who had not taken FMLA leave were suspended for the same incident. *McGarity v. Mary Kay Cosmetics,* 1998 WL 50460 (N.D.Tex.).

(2000).  *See also McArdle v. Dell Products, L.P.*, 293 Fed. Appdx. 331, 339 (5th Cir.

2008)(summary judgment is not proper when the evidence that establishes genuine issues of the

falsity of the stated reason for termination)

### ii.      Less than 10 day time lapse establishes fact issues

Moreover, although Defendant attempts to disregard the timing of the termination, the

fact the Hayden was terminated less than 10 days after submitting the request for FMLA leave

establishes material fact issues regarding the requisite causal connection between the two

events.[48]  *See Grubb v. Southwest Airlines*, 296 Fed. Appx. 383, 390 (5th Cir 2008) wherein the

Fifth Circuit explained that based on the following, the trial court had likely erred in granting

summary judgment on the "causal connection" element:

> Obviously, Grubb suffered an adverse employment action by virtue of his termination.
> Thus, the only remaining *prima facie* issue is whether his firing "was made because he
> sought protection under the FMLA." .... As a *prima facie* element, this third prong is not
> an ultimate showing of liability, but merely determines whether there is enough evidence
> to require an employer to respond. . . . . All that is required is "a causal connection
> between the protected activity and the discharge." . . . . The timing of Grubb's June 21
> termination shortly after the raising of his possible pursuit of leave in the June 9 meeting
> with supervisors is likely sufficient.

Based on the reasoning in *Grubb,* Hayden's summary judgment evidence establishes fact issues

on the causal connection.   Therefore, summary judgment is not proper on this ground

### b.   The Summary Judgment Evidence Establishes Additional Fact Issues on Pretext:

Hayden's evidence does not consist solely of a close temporal proximity, but rather also

includes evidence of the patently false stated reason for termination (as explained in detail

above), negative treatment and adverse actions following the FMLA request, including the

---

[48]  Exhibit 1, para. 20; Def's Exhibit G, para. 3.

pretextual termination of his employment.  Such evidence establishes the causal connection as well as the requisite fact issues on the element of pretext to defeat summary judgment.

### i.   Negative Reaction to the FMLA Request

In addition to the close temporal proximity between the FMLA request and the termination, it is likewise undisputed that the timing and reason for Hayden's request for FMLA leave for the birth of his child were immediately met with negativity.  First, it is undisputed that when Antoinette Narin contacted Hayden to go over his FMLA request, she questioned the large number of dates that had been requested.[49]  In particular, she stated: "It's very strange that we have a male manager request that amount of time off, we have never had that before."[50]

Disapproval was also expressed by Hayden's immediate supervisor regarding the timing of the requested leave.[51]  Specifically, Allan Bauwin upon learning of Hayden's request for 3 sets of intermittent FMLA leave dates promptly questioned human resources via e-mail whether the company had to "honor a request like this with the dates broken up."[52]  Bauwin also inquired: "Have you ever herd [sic] of someone breaking up a leave like this when expecting a child?"[53] He then set forth the reason he had a problem with each requested leave period:  "peak holiday time", "inventory" and "peak patio pottery set up/his store remodel."[54]   These statements preclude summary judgment as they clearly convey a negative attitude toward Hayden's requested leave and seek a reason to deny the request.  Had this not been a problem for Bauwin, there would have been no need for the inquiry.

---

[49]  Exhibit 1, para. 19.
[50]  *Id.*
[51]  Exhibit 8.
[52]  *Id.*
[53]  *Id.*
[54]  *Id.*

Further, in response to Bauwin's inquiries, Rita Richards, the Human Resources Manager, confirmed that there was something called intermittent leave, but then stated "I don't know the circumstances surrounding the his particular situation so I don't know how it might be eligible for the intermittent leave."[55]  Richards then suggested: "If you haven't spoken to him, as his direct supervisor you should see what he shares".  Richards further explained: "although he's not obligated to give you any particulars" . . ."he may give you insight into what he's requesting."[56]  Such a suggestion by Richards to surreptitiously question Hayden about his need for intermittent leave (no doubt in hopes of finding a reason to deny it) only further establishes fact issues regarding Defendant's negative attitude toward the leave request.  Also, noticeably absent from Richard's response is any reminder to Bauwin that it is unlawful to interfere with or retaliate against an employee for seeking FMLA leave.

Similar negative statements have defeated summary judgment in other cases. For example, the Fifth Circuit in *McArdle v. Dell Products, L.P.*, 293 Fed. Appdx. 331, 338-39 (5th Cir. 2008) found the following evidence of an e-mail and testimony of a supervisor's negative feelings towards the FMLA absences created an inference of causation:

> McArdle primarily points to two pieces of evidence to establish causation. The first piece of evidence is an e-mail sent by his immediate supervisor, Brad Lambert, to human resources representative John Adcock on August 24, 2004. August 24, 2004 is also the day McArdle filed for leave, the day Dell granted the request, and the day his leave period began. In the e-mail, Lambert expressed concern about "Brian McArdle's time away," particularly that McArdle's "extra curricular" activities, such as golfing and a trip to Las Vegas, exacerbated his back condition and necessitated additional time off. He asked for Adcock's directions and whether "[a]t some point, do we have the right to say his extra curricular activities are a concern if they interfere with his job performance?" The second piece of evidence is Adcock's deposition testimony, stating he thought Lambert, in his e-mail, "was questioning whether [McArdle's missed time] was or wasn't [legitimate]. He was unsure." Adcock also testified that Lambert "was frustrated that he

---

[55] *Id.*
[56] *Id.*

had a rep that was missing time and wanted to figure out how he could help him one way or the other.

As in *McArdle*, the undisputed negative reaction by the Defendant defeats summary judgment.[57]

### ii.   Bauwin's discriminatory animus is a factor/FMLA was discussed

No doubt because of Bauwin's admitted knowledge of the FMLA request and subsequent e-mail questioning whether it could be taken, Defendant attempts on summary judgment to discount Bauwin's role in this case by claiming that it was Laube, not Bauwin that made the termination decision.[58]   This claim is, however, refuted by not only Troutman's inconsistent claim that he actually made the decision, but is further refuted by Defendant's interrogatory answers asserting that Troutman, Laube *and Bauwin* jointly made the decision.[59]

Moreover, the Defendant admits to discussing Hayden's FMLA leave at the time of the termination.[60]   Although claiming it was only raised in the context of determining whether one could be terminated after requesting FMLA leave and that it was not a factor in the decision[61], that it was a topic of discussion at all evidences that Defendants were aware of the FMLA leave at the time.   Consequently, based on the Defendant's serious credibility problems discussed above regarding the stated reason for termination, their veracity on this point and the issue of whether the termination was a result of the FMLA request should be left to the factfinder to resolve.

### iii.  The Post-FMLA Request Search for a reason to Terminate

The evidence also establishes that although Hayden was granted his requested leave, soon

---

[57] *McArdle v. Dell Products, L.P.*, 293 Fed. Appdx. 331, 338-39 (5th Cir. 2008), also citing *Hodgens v. General Dynamics Corp.,* 144 F.3d 151 (1st Cir.1998)(held a supervisor's warnings that an employee "was taking 'too much time off' " and expressions of concern regarding the employee's absenteeism were sufficient to show causation in an FMLA retaliation case).
[58] Def.'s Motion, p. 17.
[59] Exhibit 6, p. 2-3.
[60] Exhibit 3, p. 85, line 18-p. 87, line11; Exhibit 4, p. 78, line 7-p. 79, line 20.
[61] *Id.*

afterwards he became the subject of a witch hunt.  For instance, Bauwin, who had generally been working out of the store, was suddenly there every night nitpicking Hayden's work.[62]

The most glaring example, however, of post-leave request adverse action came when Hayden was ultimately terminated for an alleged schedule violation.

### iv.   Scheduling Issue not a terminable offense until after FMLA request

In a post-FMLA request e-mail dated October 10, 2007, Bauwin suddenly forwards Troutman a copy of Hayden's October 1, 2007 e-mail regarding schedule changes.[63] Significantly, as stated above, this October 1st scheduling issue clearly did not warrant termination at the time, but rather only allegedly became a terminable offense *after* Hayden requested FMLA leave (which, as stated above, Bauwin was plainly agitated by).[64]  In a follow-up e-mail that same day, obviously designed to build a case in support of terminating Hayden, tellingly states to Troutman: "Here's what I have found in regards to Tom's schedule and ST-23 management schedule.[65]  The timing and substance of these e-mails establishes fact issues that Defendant was obviously searching for an excuse to terminate Hayden because he requested leave.

### v.   Hayden's evidence refutes the stated reason for termination

As set forth in detail above, the evidence reveals the flat-out falsity of Defendant's claim that Hayden was terminated at Laube's alleged 9/15/07 directive that one more violation would result in termination.  For that reason, summary judgment is not proper; however, even setting that point aside, the summary judgment is not proper because the evidence refutes the legitimacy

---

[62]  Exhibit 1, para. 19.
[63]  Exhibit 13.
[64]  Exhibits 8 and 13.
[65]  Exhibit 11.

of the underlying violation which was used as the excuse to terminate Hayden, i.e., that Hayden failed to follow the directive regarding scheduling.[66]   Hayden did no such thing.

The following summary judgment evidence directly refutes that Hayden failed to comply with scheduling directives as asserted by Defendant[67]:

Contrary to Bauwin's claims as outlined in Exhibit 11, Hayden had faxed a four-week schedule to Bauwin and corporate and posted it on the communication board.[68]  Prior to October 1, 2007, Bauwin had never asked or required Hayden to complete a 4-week schedule due to the Lewisville store being understaffed with managers.  Hayden never removed the 4-week schedule from the communication board, although often the office personnel and managers would remove the posted schedule to make additional copies for themselves.  Many of the managers complained that the 4-week schedule was not legible; therefore, Hayden copied only one or two weeks of the schedule on a more legible document for the managers to see.

On October 1, 2007 at or around 11:00 a.m., Hayden held his usual Monday morning managers meeting.  During this meeting, he asked the managers for input on giving him information concerning scheduling based on members of our management staff still being in the probationary period of their hire date.  In addition, one manager would be out for an entire week for a wedding and another manager was going to be out due to surgery. Hayden was asking for their input on how to handle the schedule just to get through the

---

[66]  Def's Exhibit G, para. 7.
[67]  The following statements are set forth in Exhibit 1.
[68]  Exhibit 1, para. 15.

period in light of everything that was going to happen in the next few weeks.  Hayden was gathering this information to present to Bauwin in an attempt to get clarification for scheduling holiday benefits for Hayden and one other manager since they had not taken holiday time off and they again were going to be short staffed.  This meeting was held prior to Bauwin requesting, for the first time, a 4-week schedule on Monday, October 1, 2007.

Contrary to Bauwin's statement in Exhibit 11, Janssen Morgan (who was not his Director of Stores) did not send out scheduling guidelines on September 21, 2007.  On September 21, 2007, Janssen Morgan sent out a "schedule model" to assist managers with scheduling.  Mr. Morgan states, "Attached is a base schedule to assist you in covering your stores each day.  Remember…this is a BASE schedule…you may need to flex it some to meet your specific store needs."    This email clearly indicated that there was no set policy concerning scheduling, but rather simple guidelines that could be used while allowing freedom to flex or shape the managers schedule in order to meet "your specific store needs."   During this time, the Lewisville store consisted only of a four member management staff with 2 of the 4 managers being new in their roles.

Bauwin's email also references that the Assistant General Manager, Rudy Biera was off on Saturday, October 6, 2007, Sunday, October 7, 2007 and Monday, October 8, 2007.  These dates including Friday, October 5, 2007 were pre approved by Bauwin and Troutman as Biera had an out of town wedding to attend.  Biera informed Bauwin, Troutman and Hayden of these needed off days during his interview.   Bauwin and

Troutman approved his request for this time off.  Biera restates and confirms this in an e-mail sent to Hayden.  (See Exhibit 1-M attached to Mr. Hayden's Declaration).  Biera was hired in late August or early September.  Allen Bauwin told Biera to shadow Hayden's schedule for training purposes.  For this reason, it was impossible for us to follow suggested scheduling guidelines because Biera had been on the job a very short time and was not familiar with all of the opening and closing procedures and Assistant General Manager duties.

Bauwin, Troutman and Laube were consistently made aware of Hayden's weekly manager's schedule via the document faxed to them weekly.  Also, emails were regularly sent to Bauwin making him aware of schedule changes due to being short staffed with store managers.  In addition, Hayden continued to notify Bauwin, Laube and Troutman that the store was understaffed with managers and that it would be difficult to impossible to use the model scheduling guidelines.  Bauwin states that Hayden was not scheduled to work a closing shift for the week ending October 13, 2007, however; the schedule clearly shows that Hayden was scheduled from 12 to 10 p.m., where Hayden actually ended up working from 6 a.m. until 9 p.m.  As a salaried manager, Hayden was never told by Bauwin to keep him informed when Hayden worked more hours than he was originally scheduled to work.

Because Hayden's summary judgment evidence directly refutes the claimed reason for termination, summary judgment is not proper in this case.  This coupled with the additional

evidence controverting Defendant's stated reasons and credibility conflicts establishes material

fact issues regarding whether the "stated reason" for termination was pretext for retaliation.

### vi.  Hayden Treated More Harshly

Moreover, even had Hayden failed to follow the schedule directive, the resulting

termination was far harsher than treatment given to other similarly situated non-FMLA taking

employees.[69]  For instance, James Sprinkle deviated from directive regarding moving a gondola

without first removing the product and which caused a safety hazard and several employees were

injured.  Sprinkle was not terminated at that time, but rather received a written warning instead.[70]

Laube and Troutman differ as to whether this incident violated a directive, but both agree that it

resulted in injured employees and did not warrant termination.[71]   It was only when Sprinkle

again violated policy that he was terminated.[72]   Hayden's weekly schedule incident hardly

compares, particularly when he had not had the benefit of a prior written warning.

Bruce Berry was terminated after Troutman "personally had a couple of very bad visits to

his store, and he just – he continued not to execute directives and follow policies and

procedures."[73]   Unlike, Hayden who Troutman had rated as an "A-" as recently as August of

2007, Berry's situation cannot be compared other than to demonstrate that Hayden was treated

far less favorabley when he was terminated.

---

[69]  Notably, in an effort to bolster its defense, Defendant asserts that other non-FMLA requesting employees (James Sprinkle, Bruce Berry, Norman King and William Stiglets) were terminated for failing to follow directives. See Def.'s Exhibit E, para. 9.  Defendant fails to state the circumstances of the terminations most likely because this summary judgment evidence establishes fact issues as to whether these alleged comparators were treated more favorably than Hayden, i.e., committing far more serious alleged offenses, some for which they were not immediately terminated.

[70]  Exhibit 4, p. 94, line 6—p. 95, line 17.

[71]  Exhibit 4, 94, line 6- p. 95, line 17; Exhibit 3, p. 83, line 4- p. 84, line 11.

[72]  *Id.*

[73]  Exhibit 4, p. 85, lines 11-18.

Norman King was terminated when Tom Kibarian, the CEO,  stopped in to check on the store on a night King was scheduled to close and King was not there.[74]  In addition, the manager who had been there had closed the store early. Troutman had been having real problems with King already and this was the last straw.[75]   Clearly, Hayden committed no similarly egregious offense.

Connie Estreyl was terminated by Laube despite good performance because she had allowed a customer to negotiate a price in the store.  This was a clear violation of policy.  Laube testified on the severity of the issue: "I had determined that allowing customers to negotiate a price in the store is really bad behavior. . . .Customers will actually purposely damage items to get a discount.  I had conference calls. It was clear policy we don't do it.  And for her to give that authority was just mind blowing." [76]  Again, Hayden's alleged scheduling issue hardly compares.

As to William Stiglets, Defendant only stated that he was terminated for failure to execute directives, policies and procedures.[77]   Because no details of the time frame or circumstances are provided, Stiglets' termination cannot be compared to Hayden's or used as a basis for summary judgment.

Clearly, when the evidence is viewed most favorably to Hayden, Hayden had a history of positive performance[78], yet was treated far less favorably than other managers who had not sought FMLA leave.

The Defendant also can not fall back on the fact that they allowed two other employees to take FMLA leave in the same time frame as these employees are not similarly situated.  Neither

---

[74] Exhibit 4, p. 85, line19-p. 86, line 8.
[75] *Id.*
[76] Exhibit 3, p. 92, line 7-22.
[77] Exhibit 4, p. 83, line 24-p. 84, line 9; def's Exhibit E., para. 9.
[78] Exhibit 1, paras. 1-3, 6.

requested leave during the "peak holiday time" (Thanksgiving ShopAThon) and neither were a male requesting intermittent leave that clearly had Bauwin bent out of shape.[79]

The circumstances of each of the above individuals support rather than refute Hayden's claim that he was retaliated against.

### vii.  Hayden's replacement establishes fact issues of discrimination

According to Defendant, Hayden was replaced by Craig Cockrum.[80]  Cockrum has not requested FMLA leave.[81]  Cockrum, however, has been openly violating the Defendants "Dating Policy" by dating or having a relationship for at least a nine month period of time after Hayden's termination, with his subordinate, Casey Hensley.[82]  Cockrum, a single male with no children has not been terminated for violating this corporate policy.[83]  Additionally, although Hayden was terminated for allegedly not posting a 4-week schedule, Cockrum did not begin posting a 4-week schedule until approximately March 2009.[84]  Cockrum was not terminated for not posting the 4-week schedules.[85]  Fact issues are raised by the Defendant's replacement of Hayden with Cockrum, a male who has not requested FMLA leave for the birth of a child, yet has committed a far more serious offense than Hayden's alleged scheduling issue.

The summary judgment evidence demonstrates the Defendant's lack of credibility on whether Hayden's termination was in retaliation for requesting FMLA leave. This along with Hayden's additional evidence of the falsity of the stated reason for the termination, the negative reaction and the suspicious timing precludes summary judgment in this case on Hayden's FMLA retaliation claim and entitlement claim.  *See Reeves at 122* (credibility determinations are not

---

[79]  Exhibit 8; Exhibit 3, p. 100, line 22-25; Def's. exhibit G, para. 6
[80]  Def's Ex. D, p. 53, lines 8-9.
[81]  Exhibit 6 at Interrogatory No. 10
[82]  Exhibit 2, para. 10; Exhibit 14.
[83]  Exhibit 2, para. 11.
[84]  Exhibit 2, para.  9.
[85]  *Id.*

properly made on summary judgment); *see also St. Mary's; Russell; see also Evans v. City of Bishop*, 238 F.3d 586, 590 (5th Cir. 2000) (summary judgment not proper where employee challenges the employer's claims and puts forth evidence aside from subjective belief); *Vance v. Union Planters Corp.*, 209 F.3d 438, 442 & n.3(5th  Cir. 2000)(even if evidence consists solely of employee's testimony, discrimination may be established); *McArdle v. Dell Products, L.P.*, 293 Fed. Appdx. 331, 339 (5th Cir. 2008) *citing Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 409 (5th Cir.1999) ("[T]he combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment.").

## B.  HAYDEN'S CLAIMS UNDER TITLE VII

Defendant also moves for summary judgment on Hayden's sex discrimination claim under Title VII.[86]  As with the FMLA claims, summary judgment is likewise not proper on this claim.

It is well established that a plaintiff may prove a case of sex discrimination with circumstantial evidence, using the burden shifting framework established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 219-220 (5th Cir.2001).  First, a plaintiff must first establish a prima facie case of sex discrimination followed by the employer's burden of producing a legitimate, non-discriminatory reason for its actions. *Id.*   Once the employer offers a legitimate, nondiscriminatory reason for the plaintiff's treatment, the plaintiff bears the ultimate burden of persuading the trier of fact that the defendant engaged in intentional discrimination. *Id.*   To satisfy this burden, a plaintiff must produce substantial evidence that the employer's proffered reasons for its actions were a pretext for discrimination. *Id.*   A plaintiff can establish pretext

---

[86]   Hayden asserts only sex discrimination claims under Title VII, not retaliation claims.

"either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.' " *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

To establish a prima facie case, Hayden must demonstrate that (1) he belongs to a protected group, (2) he was qualified for the position, (3) he suffered an adverse employment action; and (4) was replaced with a similarly qualified person who was not a member of the protected group, or that similarly situated employees were treated more favorably. *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.,* 245 F.3d 507, 512-13 (5th Cir.2001).

Defendant does not contest that Hayden meets the first 3 elements of the *prima facie* case[87], which he does.[88]   Rather, Defendant asserts that Hayden's sex discrimination claim fails because he was replaced by a man and was not other wise discharged because of his gender.[89] Defendant also asserts that Hayden cannot establish that his termination was a pretext for sex discrimination.[90]

Hayden's sex discrimination claim stems from the discriminatory treatment he was subjected to as result of being a male requesting FMLA leave for the birth of and to care for his child.   As has been recognized by the courts and the Equal Employment Opportunity Commission, negative treatment of male employees violates Title VII.   Indeed, the Supreme Court has observed that gender-based stereotypes may influence how male workers are perceived: "Stereotypes about women's domestic roles are reinforced by parallel stereotypes presuming a lack of domestic responsibilities for men." *See Nevada Dept. of Human Resources*

---

[87]   Def's Motion, p. 23
[88]   Hayden is a male, he was qualified for his position and was terminated by Defendant. Exhibit 1, Exhibit 4, p. 168, line 4-7.
[89]   Def's. Motion, p. 23-24.
[90]   Def's Motion, p. 24-25

*v. Hibbs*, 123 S.Ct. 1972, 1982 (U.S. 2003).   Further, according to the *EEOC's Enforcement Guidance: Unlawful Disparate Treatment of Workers with Caregiving Responsibilities* (5/23/07):

> While working women have generally borne the brunt of gender-based stereotyping, unlawful assumptions about working fathers and other male caregivers have sometimes led employers to deny male employees opportunities that have been provided to working women or to subject men who are primary caregivers to harassment or other disparate treatment. . . . While employers are permitted by Title VII to provide women with leave specifically for the period that they are incapacitated because of pregnancy, childbirth, and related medical conditions, employers may not treat either sex more favorably with respect to other kinds of leave, such as leave for childcare purposes.

Hayden was subjected to just such unlawful stereotyping and terminated because he requested FMLA leave for the birth of his child. Thus, contrary to Defendant's position, that Hayden was replaced by a man establishes material fact issues of gender discrimination in this circumstance because that man (Craig Cockrum) was not requesting FMLA time off for the birth of and to care for a child.[91]   Further, sex discrimination is particularly evident in view of the Defendant's derogatory response to Hayden's request for such leave: "It's very strange that we have a male manager request that amount of time off, we have never had that before."[92]   This unlawful stereotyping Hayden was subjected to as a result of being a male requesting extended time off for the birth and care of a child precludes summary judgment.

This negative response to a male requesting so much leave time to care for a child further establishes pretext, particularly when coupled with the termination that occurred less than 10 days later and the absolute falsity of Defendant's reason for termination (all discussed in detail in the FMLA section of this response, and incorporated herein for purposes of brevity).  Because the summary judgment evidence establishes material fact issues on the causal connection and

---

[91] Exhibit 6 at Interrogatory No. 10.
[92] Exhibit 1, para. 19.

pretext elements of Hayden's gender discrimination claim, summary judgment is not proper in this case.

**PRAYER**

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully prays that Defendant's Motion for Summary Judgment be, in all respects, DENIED.

Respectfully submitted,

**ALBIN | HARRISON | ROACH**

/s/ Connie A. Peña      
**CONNIE A. PENA**
State Bar No. 24034621
**LAURA E. CALHOUN**
State Bar No. 06342400
Granite Park III
5601 Granite Parkway, Ste 400
Plano, Texas 75024
Telephone (214) 423-5100
Facsimile (214) 423-5111
cpena@ahrlawfirm.com

***Attorneys for Tom Hayden***

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that on October 19, 2009, a true and correct copy of the foregoing document was served via ECF filing on counsel for Defendant

Paul E. Hash
Jackson Lewis
3811 Turtle Creek Blvd., Suite 500
Dallas, Texas 75219

/s/ Connie A. Peña     
